# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 69911-3-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| WILLIAM MICHAEL REIS, | ) | PUBLISHED OPINION |
| | ) | |
| Petitioner. | ) | FILED: March 31, 2014 |

SPEARMAN, A.C.J. — William Reis was charged with manufacturing a

controlled substance in violation of the Uniform Controlled Substances Act,

chapter 69.50 RCW, after a search of his residence pursuant to a warrant

revealed evidence of a marijuana growing operation. The trial court denied his

motion to suppress the evidence. The issue on discretionary review is whether,

following the 2011 amendments to the Medical Use of Cannabis Act, chapter

69.51A RCW, a search warrant must be based on probable cause of a violation

of medical marijuana laws.[1] We conclude that "qualifying patients" and

"designated providers" under the Act are able to assert only an affirmative

defense at trial to a charge of a violation of marijuana laws. The search warrant

here was supported by probable cause where it was based on evidence of a

marijuana growing operation. We affirm.

---

[1] The terms "marijuana" and "cannabis" are synonymous and will be used
interchangeably throughout our opinion. Chapter 69.51A RCW uses both terms.

FACTS

On May 15, 2012, King County Sheriff's Detective Thomas Calabrese sought a search warrant for William Reis's residence in Burien. Calabrese's affidavit contained the following information. After receiving an anonymous tip that a person named "William" was growing marijuana in the Shorewood area of Burien, Calabrese drove through Shorewood and observed marijuana plants on the back deck of Reis's home. He saw a man transferring the plants from smaller pots to larger ones. From the vantage point of a neighboring property, Calabrese saw black plastic covering one of the basement windows of Reis's home and condensation on that window, which was slightly open. He heard a distinct humming sound coming from the northwest side of the home. Based on his training and experience, Calabrese concluded that these were indications marijuana was being grown indoors. He ran the license plate of the car in the home's driveway and learned it was registered to William Reis. He learned that Reis had been arrested in 2005 and been charged with violation of the Uniformed Controlled Substances Act (VUCSA) and violation of the Uniformed Firearms Act (VUFA) after a search of the same house revealed a marijuana-growing operation in the basement. He also learned that Reis was found in possession of 1.3 grams of marijuana during a 2011 traffic stop. A booking photo of Reis matched the appearance of the man Calabrese had seen tending to the marijuana plants on the deck. Calabrese then attempted to contact Reis's neighbors to inquire about unusual short traffic stays or circumstances around the home that would indicate a drug-dealing operation. The neighbors refused to

2

speak to Calabrese, other than to state that they were fearful of Reis. On a later date, Calabrese drove by Reis's home and again saw marijuana plants on the back deck.

The district court concluded there was probable cause to believe a violation of the Uniform Controlled Substances Act, chapter 69.50 RCW, had been committed and issued a search warrant. The search warrant was served on May 21, 2012. Officers seized six mature cannabis plants from Reis's back deck. From inside the home, they seized 31 juvenile cannabis plants and roughly 13 pounds of cannabis. Officers also found a digital scale, high-intensity grow lights, a ledger, receipts for marijuana sales, and a bill of sale from "Chronic LLC." Clerk's Papers at 4-5, 33.

Reis was charged with a violation of the Uniform Controlled Substances Act, manufacturing of marijuana, during a period of time intervening between April 29, 2012 and May 21, 2012.[2] Reis moved to suppress the evidence found in his home, arguing that the search warrant was not supported by probable cause. The trial court denied his motion.[3] Reis sought discretionary review, which this court granted.[4]

---

[2] Reis's daughter, Rachael Reis, resides at Reis's home and was also charged with a violation of the Uniform Controlled Substances Act. She is not a party to this petition for review.

[3] The trial court concluded, "[I]t is clear that the legislature did not intend to decriminalize all marijuana grow operations, nor put the burden upon law enforcement to demonstrate that a grower of marijuana is not a qualified medical marijuana patient or a designated provider." CP at 92. Thus, it concluded, probable cause for a search warrant does not require law enforcement officers to investigate whether a person growing marijuana is authorized to possess or cultivate marijuana for medical purposes.

[4] The trial court certified that its order involved a controlling question of law under RAP 2.3(b)(4).

## DISCUSSION

This court reviews conclusions of law in an order pertaining to suppression of evidence de novo. State v. Mendez, 137 Wn.2d 208, 214, 970 P.2d 722 (1999), overruled on other grounds by Brendlin v. California, 551 U.S. 249, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007).

A search warrant may be issued only upon a determination of probable cause. State v. Cole, 128 Wn.2d 262, 286, 906 P.2d 925 (1995). Probable cause requires "'facts and circumstances sufficient to establish a reasonable inference that the defendant is probably involved in criminal activity and that evidence of the crime can be found at the place to be searched.'" State v. Shupe, 172 Wn. App. 341, 348, 289 P.3d 741 (2012) (quoting State v. Thein, 138 Wn.2d 133, 140, 977 P.2d 582 (1999)), rev. denied, 177 Wn.2d 1010, 302 P.3d 180 (2013). In reviewing the issuance of a search warrant, the court is limited to the information contained within the affidavit supporting probable cause. State v. Neth, 165 Wn.2d 177, 182, 196 P.3d 658 (2008).

Whether the search warrant in this case was supported by probable cause involves the interpretation of RCW 69.51A.040. This court's purpose when interpreting a statute is to enforce the intent of the legislature. Rental Housing Ass'n of Puget Sound v. City of Des Moines, 165 Wn.2d 525, 536, 199 P.3d 393 (2009). If the plain language of the statute is unambiguous, this court's inquiry ends and the statute is enforced "in accordance with its plain meaning." State v. Armendariz, 160 Wn.2d 106, 110, 156 P.3d 201 (2007). Under the "plain meaning rule," this court examines the statutory scheme as a whole, considering

the language of the statute, related statutes, and other provisions of the same act. City of Seattle v. Allison, 148 Wn.2d 75, 81, 59 P.3d 85 (2002). This court attempts to interpret statutes to give effect to all language in the statute and to render no portion meaningless or superfluous. State v. J.P., 149 Wn.2d 444, 450, 69 P.3d 318 (2003). If the statute is subject to more than one reasonable interpretation, it is ambiguous, and the court may resort to aids of statutory construction, including examining legislative history. State v. Slattum, 173 Wn. App. 640, 649, 295 P.3d 788, rev. denied, 178 Wn.2d 1010, 308 P.3d 643 (2013).

Initially, a brief discussion of relevant Washington marijuana laws is useful. Following the state legislature's 1971 passage of the Uniform Controlled Substances Act, codified as chapter 69.50 RCW, marijuana has been a Schedule I controlled substance. RCW 69.50.204(c)(22). The possession, manufacture, and delivery of marijuana is generally prohibited under Washington law.[5] See RCW 69.50.401-.445 (establishing offenses and penalties). In 1998, however, Washington citizens enacted Initiative 692, codified as chapter 69.51A RCW.[6] The purpose of the Washington State Medical Use of Cannabis Act (MUCA) was to allow certain individuals suffering from terminal or debilitating medical conditions to use marijuana medicinally. RCW 69.51A.005. The MUCA provided patients and caregivers who met certain requirements an affirmative defense:

---

[5] Initiative 502, passed in November 2012, legalized possession of small amounts of marijuana for individuals over 21 years of age. See RCW 69.50.4013 (possession, by person twenty-one years of age or older, of useable marijuana in amounts not exceeding those set forth in RCW 69.50.360(3) is not a violation of any provision of Washington state law). Initiative 502 has no bearing on this case.

[6] The legislature has amended the Act several times since its enactment.

> If charged with a violation of state law relating to marijuana, any qualifying patient who is engaged in the medical use of marijuana, or any designated primary caregiver who assists a qualifying patient in the medical use of marijuana, will be deemed to have established an affirmative defense to such charges by proof of his or her compliance with the requirements provided in this chapter. Any person meeting the requirements appropriate to his or her status under this chapter shall be considered to have engaged in activities permitted by this chapter and shall not be penalized in any manner, or denied any right or privilege, for such actions.

Former RCW 69.51A.040(1) (1999). The statute was amended in 2007 but continued to provide for an affirmative defense to qualifying patients or designated providers charged with a violation of state laws relating to marijuana. Laws of 2007, ch. 371, § 5; former RCW 69.51A.040(2) (2010).

In State v. Fry, 168 Wn.2d 1, 5, 228 P.3d 1 (2010), the Washington Supreme Court considered whether a search warrant was supported by probable cause where police officers were informed that marijuana was being grown at a certain residence and smelled marijuana upon arrival but the defendant, Fry, presented a purported medical authorization form for marijuana. Fry argued that probable cause to search was negated when he produced the authorization. Id. at 3-4, 6. A plurality of the Court,[7] observing that RCW 69.51A.040 established an affirmative defense against marijuana charges, concluded that the presentment of a person's purported authorization for medical marijuana was a

---

[7] This opinion was signed by four justices. Four other justices concurred in result only. Id. at 20 (Chambers, J., concurring).

requirement for the affirmative defense but nonetheless did not negate probable

cause for a search.[8] Id. at 7-10. The plurality explained:

> As an affirmative defense, the [medical marijuana] defense does
> not eliminate probable cause where a trained officer detects the
> odor of marijuana. A doctor's authorization does not indicate that
> the presenter is totally complying with the Act: e.g., the amounts
> may be excessive. An affirmative defense does not per se legalize
> an activity and does not negate probable cause that a crime has
> been committed.

Id. at 10.

In 2011, the legislature made amendments to the MUCA. Laws of 2011,

ch. 181. The legislature's intent, in part, was to protect qualifying patients from

arrest, prosecution, criminal sanctions, and civil consequences based solely on

their medical use of marijuana and to protect designated providers from the same

consequences based solely on their assistance with the medical use of

marijuana. Laws of 2011, ch. 181, § 102, codified as RCW 69.51A.005(2).

Following the amendments, RCW 69.51A.040 now provides:

> The medical use of cannabis in accordance with the terms and
> conditions of this chapter does not constitute a crime and a
> qualifying patient or designated provider in compliance with the
> terms and conditions of this chapter may not be arrested,
> prosecuted, or subject to other criminal sanctions or civil
> consequences, for possession, manufacture, or delivery of, or for
> possession with intent to manufacture or deliver, cannabis under
> state law, or have real or personal property seized or forfeited for
> possession, manufacture, or delivery of, or for possession with
> intent to manufacture or deliver, cannabis under state law, and
> investigating peace officers and law enforcement agencies may not
> be held civilly liable for failure to seize cannabis in this
> circumstance, if:

---

[8] The Fry plurality also observed, "It is difficult to imagine how a law enforcement officer, having been presented with a medical marijuana authorization, would be able to determine that the marijuana is otherwise being lawfully possessed . . . without some kind of search." Id. at 6.

(1)(a) The qualifying patient or designated provider possesses no more than fifteen cannabis plants and:

(i) No more than twenty-four ounces of useable cannabis;

(ii) No more cannabis product than what could reasonably be produced with no more than twenty-four ounces of useable cannabis; or

(iii) A combination of useable cannabis and cannabis product that does not exceed a combined total representing possession and processing of no more than twenty-four ounces of useable cannabis.

(b) If a person is both a qualifying patient and a designated provider for another qualifying patient, the person may possess no more than twice the amounts described in (a) of this subsection, whether the plants, useable cannabis, and cannabis product are possessed individually or in combination between the qualifying patient and his or her designated provider;

(2) The qualifying patient or designated provider presents his or her proof of registration with the department of health, to any peace officer who questions the patient or provider regarding his or her medical use of cannabis;

(3) The qualifying patient or designated provider keeps a copy of his or her proof of registration with the registry established in *section 901[9] of this act and the qualifying patient or designated provider's contact information posted prominently next to any cannabis plants, cannabis products, or useable cannabis located at his or her residence;

(4) The investigating peace officer does not possess evidence that:

(a) The designated provider has converted cannabis produced or obtained for the qualifying patient for his or her own personal use or benefit; or

(b) The qualifying patient has converted cannabis produced or obtained for his or her own medical use to the qualifying patient's personal, nonmedical use or benefit;

(5) The investigating peace officer does not possess evidence that the designated provider has served as a designated provider to more than one qualifying patient within a fifteen-day period; and

(6) The investigating peace officer has not observed evidence of any of the circumstances identified in *section 901(4) of this act.

---

[9] The "*Reviser's note" to RCW 69.51A.040 states, "Section 901 of this act was vetoed by the governor."

RCW 69.51A.040 thus provides protection against arrest, prosecution, criminal sanctions, and civil consequences for qualifying patients[10] and designated providers[11] who, among other things, register with the department of health.[12] In contrast, qualifying patients and designated providers who do not register but otherwise meet the requirements of RCW 69.51A.040 and other specified requirements may, as before the 2011 amendments, assert an affirmative defense at trial. RCW 69.51A.043.

Reis argues that the plain language of RCW 69.51A.040, following the 2011 amendments, made the use and cultivation of medical marijuana presumptively legal in certain circumstances. He contends Fry no longer applies and that law enforcement must demonstrate probable cause of a violation of the Act to obtain a search warrant. The State's response is two-fold. First it argues that the heightened protections in RCW 69.51A.040 against arrest, prosecution,

___

[10] "'Qualifying patient' means a person who:
(a) Is a patient of a health care professional;
(b) Has been diagnosed by that health care professional as having a terminal or debilitating medical condition;
(c) Is a resident of the state of Washington at the time of such diagnosis;
(d) Has been advised by that health care professional about the risks and benefits of the medical use of marijuana; and (e) Has been advised by that health care professional that they may benefit from the medical use of marijuana.'"
RCW 69.51A.010(4).

[11] "'Designated provider' means a person who:
(a) Is eighteen years of age or older;
(b) Has been designated in writing by a patient to serve as a designated provider under this chapter;
(c) Is prohibited from consuming marijuana obtained for the personal, medical use of the patient for whom the individual is acting as designated provider; and
(d) Is the designated provider to only one patient at any one time.'"
RCW 69.51A.010(1).

[12] The legislature's intent in enacting the 2011 amendments, as stated in RCW 69.51A.005(2), was to protect qualifying patients and designated providers from arrest, prosecution, criminal sanctions, and civil consequences based solely on their use of or assistance with medical marijuana.

9

criminal sanctions, and civil consequences apply only to those qualifying patients and designated providers who are included in a registry. Second, it contends that because the registry was never established (due to the governor's veto of the sections of chapter 181 that would have established a registry for qualifying patients and designated providers), nobody can meet the requirements of the statute. Thus, the State argues, a defendant who is in compliance with the MUCA, as written subsequent to the governor's veto, may only assert an affirmative defense to an alleged violation of Washington state marijuana laws. We agree with the State.

The plain language of RCW 69.51A.040 provides that "[t]he medical use of cannabis <u>in accordance with the terms and conditions of this chapter</u> does not constitute a crime and a qualifying patient or designated provider <u>in compliance with the terms and conditions of this chapter</u> may not be arrested, prosecuted, or subject to other criminal sanctions or civil consequences" if certain specified requirements are met. RCW 69.51A.040 (emphasis added). But several of the "terms and conditions" of the statute, insofar as an individual, asserts that he or she did not commit a crime and seeks the protections against arrest, prosecution, criminal sanctions, and civil consequences, cannot be met. Subsections (2), (3), and (6) set forth requirements relating to registration with the department of health or Section 901. As the code reviser's note to RCW 69.51A.040 explains,

Section 901 was vetoed by the governor.[13] Section 901 would have required the department of health to adopt, by January 1, 2013, rules for the establishment of a registration system. Section 901 also would have, with certain exceptions, required law enforcement investigating a marijuana-related incident to make reasonable efforts to determine whether the location or person under investigation was registered before seeking a nonvehicle search warrant or arrest warrant. Ch. 181, § 901(4) (vetoed). Because there was no registry established, it is impossible for anyone to be registered or for police to check the registry before seeking a search warrant. Thus, by default, qualifying patients and designated providers are entitled only to an affirmative defense.

Reis contends that, because Section 901 was vetoed by the governor, the MUCA must be read as though Section 901 and any provision referencing the registry was never considered by the legislature. He cites Shelton Hotel Co. v. Bates, 4 Wn.2d 498, 104 P.2d 478 (1940) and Hallin v. Trent, 94 Wn.2d 671, 619 P.2d 357 (1980). Those cases support the proposition that when the governor

---

[13] The governor was concerned that the sections of the legislation that would direct employees of the state departments of health and agriculture to authorize and license cannabis businesses would require such employees to violate federal criminal law and expose them to federal prosecution, particularly where "the United States Attorneys have made it clear that state law would not provide these individuals safe harbor from federal prosecution." Laws of 2011, ch. 181, governor's veto message at 1375. With regard to the registry provisions, the Governor explained that these were associated with or dependent upon the licensing sections:

> I am also open to legislation that establishes a secure and confidential registration system to provide arrest and seizure protections under state law to qualifying patients and those who assist them. Unfortunately, the provisions of Section 901 that would provide a registry for qualifying patients and designated providers beginning in January 2013 are intertwined with requirements for registration of licensed commercial producers, processors and dispensers of cannabis. Consequently, I have vetoed section 901 . . . I am not vetoing sections 402 or 406, which establish affirmative defenses for a qualifying patient or designated provider who is not registered with the registry established in section 901. Because these sections govern those who have not registered, this section is meaningful even though section 901 has been vetoed.

Id.

acts on a bill voted on by both houses of the legislature, he or she acts in a legislative capacity and the intent of the legislature cannot be considered apart from the governor's intent. Shelton Hotel, 4 Wn.2d at 506; Hallin, 94 Wn.2d at 677. Furthermore, "[t]he Governor's veto of a portion of a measure, if the veto is not overridden, removes the vetoed material from the legislation as effectively as though it had never been considered by the legislature." Hallin, 94 Wn.2d at 677; see also Shelton Hotel, 4 Wn.2d at 506 ("'In exercising the veto power, the Governor acts as a part of the legislative bodies and the act is to be considered now just as it would have been if the vetoed provisions had never been written into the bill at any stage of the proceedings.'") (quoting State ex rel Stiner v. Yelle, 174 Wash. 402, 408, 25 P.2d 91 (1933)).

Thus, under Hallin and Shelton Hotel, the MUCA must be read without the sections that were actually vetoed by the governor. Here, the governor vetoed Section 901 but not Section 401, which amended RCW 69.51A.040.[14] Reis contends, nevertheless, that any references to Section 901 or registration/the registry that remain in Section 401/RCW 69.51A.040 are "incidentally vetoed" and "manifestly obsolete" after the Governor's veto, quoting Washington Fed'n of State Employees, AFL-CIO, Council 8, AFSCME v. State, 101 Wn.2d 536, 682 P.2d 869 (1984). Thus, he contends, subsections (2) and (6) and part of subsection (3) (through the words "section 901 of this act") of RCW 69.51A.040 were effectively removed from the statute as "terms and conditions" of lawful use for qualifying patients and designated providers. Similarly, Reis contends that,

---

[14] The governor did not strike any language relating to the registry/registration or Section 901 from Section 401. As Reis notes, the governor may only veto entire sections of nonappropriation bills, not portions within sections. Const. art. 3, § 12 (amend. 62).

12

following the governor's veto of Section 901, the affirmative defense established in RCW 69.51A.043 for those who fail to register is removed as though it had never been considered by the legislature. Thus, he contends, the 2011 amendments to the MUCA made medical marijuana use presumptively legal for all qualifying patients and designated providers who met the remaining terms and conditions set forth in RCW 61.51A.040.

We reject these arguments. Washington Federation does not support the proposition that subsections (2), (6), and part of subsection (3) must be read out of the statute and not considered "terms and conditions." In Washington Federation, the state legislature amended state civil service laws to permit performance to be considered in matters of compensation, reduction in force, and reemployment. Id. at 537. The Governor approved the bill, Substitute House Bill 1226, 47th Legislature, 1st Ex. Sess. (1982), but vetoed Section 30 and all references thereto. Section 30 would have called for legislative review and approval of the proposed administrative rules for implementing the act, and the legislature's failure to approve the rules would have voided several sections of the act. Id. at 538. The Governor found that implementation of Section 30 would have created too much uncertainty as to the effectiveness of the law. Id. A union brought suit against the State and Governor, among others, challenging certain sections of the law and the validity of the governor's veto of Section 30. Id. at 539. The union argued that the Governor's veto was invalid, in relevant part,

because it was prohibited under Const. art. 3, § 12 (amend. 62) as an item veto.[15] Id. at 543. The Washington Supreme Court rejected the union's argument:

> The veto of Governor Spellman was of an entire section and was valid. The deleted references to section 30 were incidentally vetoed purely as a ministerial act. If not deleted, the Code Reviser, pursuant to RCW 1.08.015(2)(m), would have taken out such "manifestly obsolete" references.

Id. at 544. RCW 1.08.015(2)(m) provides that the code reviser shall edit and revise laws enacted by the legislature, "to the extent deemed necessary or desirable by the reviser and without changing the meaning of any such law, in the following respects only . . . (m) Strike provisions manifestly obsolete."

In Washington Federation, Section 30 was vetoed, and the references to Section 30 could be removed from the other parts of the legislation without changing the meaning of the sections of the legislation not vetoed. Here, the registration requirements under RCW 69.51A.040 are substantive requirements under the legislation passed, particularly when read in conjunction with the affirmative defense under RCW 69.51A.043, which is available for those who do not register. A material distinction between the two categories of individuals under RCW 69.51A.040 and RCW 69.51A.043 is the fact of registration. The registration requirements are not merely "manifestly obsolete" references to a vetoed section that have no practical effect on the intended functioning of the statute. Washington Federation is distinguishable.

---

[15] Under Const. art. 3, § 12 (amend. 62),
If any bill presented to the governor contain[s] several sections or appropriation items, he may object to one or more sections or appropriation items while approving other portions of the bill: Provided, That he may not object to less than an entire section, except that if the section contain[s] one or more appropriation items he may object to any such appropriation item or items.

We disagree that the Governor's veto eliminated the affirmative defense. Such an interpretation is at odds with the plain language of the statute as amended by the legislation.[16] The statute provides different protections for qualifying patients and designated providers who register and those who do not register. Under RCW 69.51A.043, qualifying patients and designated providers who are not registered but meet other requirements may only assert an affirmative defense at trial. Reis's interpretation would permit those who do not register to receive the same protection against arrest, prosecution, criminal sanctions, and civil consequences that the statute provides only for those who registered. Reis's argument ignores the affirmative defense set forth in RCW 69.51A.043 because, if medical marijuana use is presumed legal, there would be no need for an affirmative defense. An affirmative defense admits the defendant committed a criminal act but pleads an excuse for doing so. Fry, 168 Wn.2d at 7 (citing State v. Votava, 149 Wn.2d 178, 187-88, 66 P.3d 1050 (2003)).

Reis also cites a recent Washington Supreme Court case, State v. Kurtz, 178 Wn.2d 466, 309 P.3d 472 (2013) to support his contention that the Act legalizes medical cannabis possession. In Kurtz, the Court stated that "in 2011 the legislature amended the Act making qualifying marijuana use a legal use, not simply an affirmative defense." Id. at 476. But the issue in Kurtz was whether the former Act superseded the common law medical necessity defense for marijuana. The Court held that it did not. Id. at 479. Kurtz cannot be read to

_____

[16] Moreover, the governor did not intend to invalidate the affirmative defense provisions. As the governor pointed out in her veto message, because RCW 69.51A.043, RCW 69.51A.045, and RCW 69.51A.047 always governed those who are not registered, the affirmative defense provisions are "meaningful even though section 901 has been vetoed." Laws of 2011, ch. 181, governor's veto message at 1376.

stand for the proposition that the amendments decriminalized marijuana use for defendants who were unregistered and therefore not qualified marijuana users.

Reis argues that if there is any ambiguity in the statute, the rule of lenity requires this court to construe the statute strictly against the State and in his favor. The rule of lenity requires that, where two possible constructions of a statute are permissible, the statute must be strictly construed against the State and in favor of the accused. State v. Gore, 101 Wn.2d 481, 485-86, 681 P.2d 227 (1984). But RCW 69.51A.040 is not ambiguous; it plainly sets forth certain requirements that cannot be met by anyone until and unless the Act is amended to provide for a registry. The rule of lenity does not apply.

In sum, while the legislative intent of the 2011 amendments, as codified in RCW 69.51A.010(2), was that qualifying patients and designated providers shall not be arrested, prosecuted, or subject to other criminal sanctions or civil consequences based solely on their use of or assistance with medical cannabis, RCW 69.51A.040 cannot currently be enforced to the extent an individual asserts medical marijuana use "in accordance with the terms and conditions of this chapter." The protections against arrest, prosecution, criminal sanctions, and civil consequences would apply only to qualifying patients and designated providers who are registered. Currently no one can register. Thus, qualifying patients and designated providers are left to assert an affirmative defense. It is undisputed that, under Fry, the possible existence of an affirmative defense does not negate

16

probable cause.[17] The trial court did not err in denying Reis's motion to suppress.[18]

Affirmed.

WE CONCUR:

_Speer__, A.C.J._

_Dwyer, J._

_Schindler, J._

---

[17] Reis concedes that a search warrant affidavit need not defeat affirmative defenses and that, if the Act merely provides an affirmative defense, the court's inquiry would end.

[18] A recent decision by Division III, State v. Ellis, __ Wn. App. __, 315 P.3d 1170 (2014), addresses a similar issue. There, the defendant argued that while the affidavit for a warrant to search his home may have presented probable cause to believe he was growing marijuana, it did not present probable cause to believe he was violating the Act in doing so. Id. at 1172. Division III held that an affidavit supporting a search warrant need not also show the inapplicability of the Act. Id. at 1173. The Court reasoned that the Act created a potential medical use exception to the Controlled Substances Act's general rule criminalizing marijuana manufacturing, and that for probable cause purposes the exception "functions about the same as the old medical use affirmative defense provided in former RCW 69.51A.040(1) (1999)." Id. Because the Act did not per se legalize marijuana or alter the elements of a Controlled Substances Act violation, the court concluded that the reasoning of Fry survived the 2011 amendments to the Act. Id. We do not depart from the result in Ellis.